FRANCISCO CARDONA, Petitioner, *v.* DISTRICT COURT OF HUMACAO ET AL., Respondents.

No. 84. Argued April 12, 1943.—Decided May 18, 1943.

*José López Baralt* and *Juan E. Géigel* for petitioner. *Nicolás Lecá-roz Largé, M. Avilés Bracero, Pedro Santana, Jr., Law Clerks of the Department of Labor*, for the respondent workmen. *E. Martínez Rivera, F. Fernández Cuyar, Bauzá & Bauzá, C. Ruiz Nazario; A. Ortiz Toro, E. Font Suárez, E. Martínez Avilés, F. M. Cadilla, G. Zeno Sama, Antonio Lens Cuena, Hartzell, Kelley & Hartzell*, and *Rafael O. Fernández* as *amici curiae*.

Mr. Justice Snyder delivered the opinion of the court.

Pursuant to Act No. 10 of 1917 (Vol. II, p. 216), as amended, fifteen agricultural workers filed complaints in the Municipal Court of San Lorenzo against the petitioner for unpaid wages. A sample complaint alleged a verbal contract between the plaintiff and the petitioner. "That the plaintiff would render services as a cart driver (*carretero*) during the cane-grinding season for compensation of $1.68 a day. That during 56 days he worked 4 extra hours daily in excess of the 8 regular hours of the ordinary workday, that is, a total of 224 extra hours, that at the double rate of pay, amounts to the sum of $94.08, a sum that the defendant refuses to pay . . . ".

The Municipal Court dismissed the complaints. On appeal to the District Court of Humacao, that court overruled demurrers to the complaints, holding that Act No. 49, Laws of Puerto Rico, Special Session, 1935, provided for payment to workmen of double pay for all hours worked in excess of eight hours in any one day. At the request of all the parties involved herein, we issued a preliminary writ of prohibition directed to the district judge (See *Fortuna Estates* v. *Texidor, Dist. Judge*, 26 P.R.R. 233; *P. R. Ry. Light & Power Co.* v. *Ortiz, Judge*, 59 P.R.R. 912; *Abelleira* v. *District Court of Appeal, Third District*, 109 P.(2d) 942 (Calif. 1941). Comment, Extent to Which Availability of Ordinary Remedy Defeats Issuance of Writ of Prohibition, 22 Calif. L. Rev. 537).

We are met at the outset with the contention of the employees that this case should be governed by the following language found in *Turney* v. *J. H. Tillman Co.*, 228 P. 933, at p. 937:

"There is, however, no allegation in the complaint that the defendant violated the statute in question or committed any crime. The presumption is, until otherwise shown, that the defendant is innocent of crime or wrong. Or. L. § 799, subd. 1. The statute presumes that private transactions have been regular and fair and that

the ordinary course of business has been followed. Or. L. § 799, subds. 19 and 20. In the absence of any allegation to the contrary, in construing the complaint it must be presumed that the defendant performed its duty and permitted or required the parties named to work overtime by reason of necessity, emergency, or where public policy absolutely required it, and that there was no other labor of like skill and efficiency which had not been employed full time, available.''

If we adopted this view, we would need to go no further to dispose of the instant case, as Act No. 49 clearly provides for double pay for overtime worked in an emergency.

We are willing—indeed it is our duty under §6 of Act No. 10—to be as indulgent as possible in the matter of pleading in order that workers, without losing their cases on technical questions, may have a hearing on the merits. But for us to accept such a presumption in this case would be to defeat the purpose for which we issued the writ. All the parties joined in urging us to issue the writ herein, asserting that it was in the public interest for this court to furnish guidance to the lower courts in handling thousands of cases involving claims for millions of dollars for normal work. It would therefore be a futile gesture for us to dispose of this case by accepting the argument that we must presume that as a matter of technical pleading the work herein was done under permit during an emergency. If our ruling in this case is to be of any guidance in solving the problem which prompted us to issue the writ, we must, apart from any theory of pleading, treat the work done as normal work. We therefore undertake to determine if Act No. 49 provides for double pay for work in excess of eight hours a day under normal conditions.

There can be little question that Act No. 49 is not a wage law, and that its sole purpose was to limit the hours of work of a normal day. The legislative history of Act No. 49 demonstrates beyond peradventure that the Commissioner of Labor and the Legislature were motivated by the

desire (*a*) to improve the health of employees and (*b*) to relieve unemployment.[1] It was on this theory that the constitutionality of Act No. 49 was sustained in *M. Taboada & Co.* v. *Rivera, Corm'r.,* 51 P.R.R. 246. The Act was never intended to regulate wages earned under normal conditions. Indeed, the effort of a previous Legislature to provide such a minimum wage law for women was temporarily thwarted, not by this Court (*People* v. *Alvarez,* 28 P.R.R. 882), but by a ruling of the Supreme Court of the United States (*Adkins* v. *Children's Hospital,* 261 U. S. 525; *People* v. *Successors of Laurnage & Co.,* 32 P.R.R. 766). While the *Adkins* case was overruled in 1937 by *West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379, when Act No. 49 was enacted in 1935 the *Adkins* case was still controlling. After the doctrine that a State cannot enact a minimum wage law was swept away in 1937 by the *Parrish* case, this court in 1940 returned to its original position sustaining the minimum wage law for women (*Irizarry* v. *Rivera Martínez,* 56 P.R.R.

---

(1)"We deem it desirable to insist respectfully before the Senate that House Bill No. 2 be passed, exactly as it was approved by the House of Representatives, if the intention to piomote the plan of constructive reforms and measures tending to absorb part of the unemployed really exists.

" . . . . . . . .

"The International Labor Congress has just established the forty-hour week, and the universal tendency as a means of reducing unemployment is to limit working hours everywhere."

Minutes of the Senate of Pue:to Rico, 1935, pp. 1212, 1213.

"Limitations of the workday is more favorable to industry than to the workman, because it provides him adequate rest and hence enables him from the human point of view to render more efficient service in his respective industry.

"It is our aim, and we shall constantly demand it from the Legislature, that hours of work in Puerto Rico be reduced in such a way as to enable industry to take care of a large portion of the unemployed, which is more than 375,000 persons."

Minutes of the House of Representatives of Puerto Rico, 1935, p. 1359.

"In almost any movement in which agricultural workers have participated in order to improve living and working conditions, the first demand has been for an eight-hour day, which has seldom been achieved, and even if it has been frequently included in documents settling strikes, it has always been a dead letter due to lack of necessary inspection and of legal regulations which would result in the enforcement of such agreements. If the present bill becomes a law, it will be unnecessary, as soon as it goes into effect, to demand an eight-hour day

495), and the Legislature in 1941 undertook to set up the framework for universal minimum wage regulation (Act No. 8, Laws of Puerto Rico, 1941, p. 302). But Act No. 49, as passed by a 1935 Legislature, which was aware of the limitations then existing on it and on this court against legislating on minimum wages, contained no wage provisions as such.

In making this statement, we are not overlooking the provision of §1 of Act No. 49 for double pay for the ninth hour and for overtime worked in an emergency. But this is not a wage provision; it is a method of insuring compliance with the provision limiting hours of work. An Oregon statute smilar to ours was upheld as valid in *Bunting* v. *Oregon,* 243 U. S. 426, on the ground that it was a statute limiting hours, and not fixing wages. At that time, as we have seen, the prevailing view of the Supreme Court of the United States was that a statute regulating wages would be uncon-

as a condition of industrial peace, for officials in charge of enforcing the laws will be ready to so require, and the workman who might consent to work more than eight hours, or the employer who might demand that he work more than eight hours, would violate the penal clause provided in the bill. Therefore, what has constituted a controversial right fought for during so many labor conflicts, will become a positive and inalienable right, the exercise and enjoyment of which the State will undertake to guarantee.

" . . . . . . . .

"It has been ascertained that at present the workmen affected have been working at least twelve hours a day during seven days a week, and it is not difficult for any person who observes and studies with detachment the provisions of this bill to reach the conclusion that it constitutes a great improvement and conquest worth bearing in mind and protecting, for as soon as the act becomes effective, nobody will be under the obligation of working more than eight hours a day, and cannot do so even voluntarily, unless emergencies declared as set forth in the law, exist.

" . . . . . . . .

"If the bill in question should become the law on the matter in this Island, the working classes will have acquired what has cost so many lives and might continue to so cost, if we had not, by passing the bill in the manner the Senate has definitely passed it, disposed of the most difficult demand of the workmen in their struggle for better living conditions and wider opportunities for work.

" . . . . . . . . ."

Minutes of the Senate of Puerto Rico, 1935, pp. 1336–1340.

stitutional. The Supreme Court specifically rejected the contention in the *Bunting* case, which the employees also make here, that the overtime provision was in effect a wage law and not an hours-of-service law. The Court says at pp. 436, 7: "There is a certain verbal plausibility in the contention that it was intended to permit 13 hours' work if there be 15½ hours' pay, but the plausibility disappears upon reflection. The provision for overtime is permissive, in the same sense that any penalty may be said to be permissive. Its purpose is to deter by its burden and its adequacy for this was a matter of legislative judgment under the particular circumstances. It may not achieve its end, but its insufficiency cannot change its character from penalty to permission." The Supreme Court therefore accepted the finding of the Supreme Court of Oregon that (p. 435) " 'the aim of the statute is to fix the maximum hours of service in certain industries. The act makes no attempt to fix the standard of wages. No maximum or minimum wage is named. That is left wholly to the contracting parties.' "

As in the Oregon statutes, our provision for overtime work in the event of an emergency, like the unfettered permission for three extra hours in Oregon, is part and parcel of a limitation-of-hours provision. The Oregon statute established a maximum workday of ten hours, but with the proviso that three additional hours could be worked if time and a half was paid. Our Legislature may have thought it was being more progressive than Oregon when it insisted that no work at all could be done beyond the maximum per day, on pain of criminal penalty, except during carefully defined emergencies, which would not be apt to be feigned because of the deterring feature of double pay. Although a more effective way to prevent overtime may be to make it legal but at double pay rather than to prohibit it, the fact remains that the latter approach was used by our Legislature.

When a bill similar to Act No. 49 was originally enacted at the regular 1935 session, the Governor vetoed it because of its inflexibility in failing to provide that in emergencies overtime work would be permitted. And when this defect was corrected at the 1935 Special Session, in Act No. 49, authorizing overtime work in emergencies, it was to safeguard against over indulgence on the part of the government in granting such permits that the provision for double pay for work during such emergencies was inserted in the law. But both the legislative history and the Act itself are clear that the Legislature was not providing for overtime without limitation, provided payment was made therefor at double the ordinary rate of pay. Indeed, such a proviso, unless it succeeded in deterring such employment, would have been in direct contradiction to the stated purposes of the Act; namely, the health of the employees, and spreading the available work among as many as possible. Working twelve hours daily as a regular proposition, even though overtime pay for the last four hours is received, does not promote health. And permitting one man to work twelve hours, instead of stopping him after eight hours and letting another take his place, does not relieve unemployment.

It is obvious from the above discussion that Act No. 49 does not in the insular field cover the same ground or use the same approach as the Fair Labor Standards Act of 1938 ($2 Stat. 1060) in the Federal sphere. In the first place, as already noted, there is no provision in Act No. 49, as in the Federal Act, for normal work for minimum wages. Unless collective bargaining prevented, starvation wages could be paid with impunity under Act No. 49. Under such a system a worker would find small comfort in receiving double pay for overtime. If one worked, for example, eight hours a day at an agreed rate of two cents an hour, four cents an hour for the next four hours could scarcely be characterized as a step in the emancipation of labor.

The second important difference between Act No. 49 and the Federal Act is that the Federal Act has more than one string to its bow of enforcement. Act No. 49, as we have seen, has as its sole purpose limitation of the hours of work. This is also one of the purposes of the Federal statute. But the Federal Act, drawing on the experience gained under local statutes, including the Puerto Rican statute, makes a different, and more effective, approach to the problem. Statutes affecting labor cut a wide swath in a community. When put in terms of a police measure, with exclusively criminal sanctions, they have proved difficult, if not impossible, to enforce. It was discovered that statutes reaching into every home and every commercial enterprise could never be fully and effectively enforced with criminal sanctions alone. Subsequent legislation hit upon a formula of enforcement which is virtually self-executing and may therefore prove foolproof. This principle is embodied in that portion of the Federal Fair Labor Standards Act which, instead of making it a crime for employers to require its employees to work in excess of the statutory limitation, provides for no limit whatsoever, but instead inserts the pragmatic provision that time worked in excess of the statutory limitation must be paid for at 1½ times the regular rate of pay (29 U.S.C. §207). This feature of the Federal Act is just as much a maximum hour provision as Act No. 49 (*United States* v. *Darby,* 312 U. S. 100, 125; *Overnight Motor Co.* v. *Missel,* 316 U. S. 572, 576-8). The only difference is that civil suit by the workmen for pay at time and a half is substituted for criminal prosecution as the driving wedge of enforcement. The health of employees is preserved and the work spread by deterring overtime work, not through criminal prosecution, but by making it prohibitively expensive. Triple damage suits by consumers under the Federal Emergency Price Control Act (50 U.S.C. §925(*e*)) is a similar illustration of the manner in which the philosophy of criminal pros-

ecution alone as a method of obtaining compliance with regulatory statutes has either given way or has been bolstered by private civil suits of aggrieved parties. Criminal sanctions, at least standing alone, have simply failed to prove themselves as an effective deterrent in this field.

The Fair Labor Standards Act is thoroughly practical. It wisely abandoned the effort to prohibit criminally the working of overtime as such; it provided only that employers must pay time and a half for such overtime—and the failure to pay for overtime, not the work as such, was made the crime (29 U.S.C. §216(a)). In addition, the right to such overtime pay was reinforced by a provision for further liquidated damages equal to the overtime wage in the event the overtime wage was not originally paid (29 U.S.C. §216 (b)). An employer surrounded by such effective civil sanctions will exhibit small concern for the possibility of criminal prosecution. The threat of civil suit, plus liquidated damages, will be the real deterrent. Our Legislature in 1941 borrowed a leaf from the Federal statute and provided in §25 of Act No. 8 of 1941 (Laws of 1941, p. 302), creating the Minimum Wage Board, for civil suit by the worker for his wages ''plus an amount equal to fifty (50) per cent of the unpaid amounts as an additional penalty''.

But when we turn to Act No. 49 of 1935 we find provisions quite different from those in the Federal statute just discussed. Section 1 provides only that ''No person shall be employed or shall be permitted to work in any commercial, industrial, or agricultural establishment or in any other lucrative business more than eight (8) hours during any natural day, except in case of some extraordinary event of emergency caused by fire, famine, or flood, or danger to life, property, or public safety or health or under any other special circumstance, provided that the Governor of Puerto Rico, on recommendation of the Commissioner of Labor, subsequently declares that the provisions of this Act shall not apply in these excepted cases and that therefore the

violations committed were excusable; *Provided,* That the limit of eight (8) hours established by this section, in all normal labor aside from the exceptions already noted, may be extended to a period that shall not exceed nine (9) hours during any natural day, on condition that every person so employed for wages, by the day, or otherwise, for more than eight (8) hours during any natural day, shall be paid for the work that he does during such extra time at a rate double that of the wages being paid him by the hour for the preceding work." Section 8 provides that any employer violating Act No. 49 shall be guilty of a misdemeanor.

It is immediately apparent that Act No. 49, as some earlier state statutes, relied on the threat of imprisonment or fine to keep employers in line. The statute flatly prohibits a normal working day of more than eight hours on pain of imprisonment or fine. It is silent as to civil sanctions for the benefit of the worker. The employees herein nevertheless assert that provision for such civil sanctions, in the way of double pay for normal work in excess of eight hours per day, can be gathered from the terms of Act No. 49, particularly when the purposes of the Act are borne in mind and when the Act is read together with two other statutes. We therefore turn to those two statutes.

Section 553 of the Penal Code, as amended by Act No. 306, Laws of Puerto Rico, 1938 (p. 547), provides that commercial and industrial establishments, with certain specified exceptions, shall remain closed all day on Sunday, and shall close at 12 noon on legal holidays, at 9 p. m. on Saturdays, and at 6 p. m. on week days. And "one hour after closing, no work of any kind shall be permitted . . . ". The only enforcement provision is a criminal penalty of fine or imprisonment for employers violating the Act. Consequently, there could certainly be no theory on which we could hold that, standing alone, this statute specifically provided for *double* pay for time worked in violation of the statute.

Act No. 80, Laws of Puerto Rico, 1931 (p. 496), as amended by Act No. 24, Laws of Puerto Rico, 1935 (p. 188), authorizes the Commissioner of Labor to grant permits to employers in commercial or industrial establishments to employ persons during extra hours of the day or night in order to complete urgent or necessary work which must be finished within a determined period of time. This statute provides for a double rate of wages for each hour thus worked. Act No. 80 was obviously a product of experience gained under §553. It having been discovered that it was for the benefit of the community as a whole that such establishments be permitted to remain open to complete work under certain special circumstances, provision was made that temporary waiver of the law could be obtained by permit from the Commissioner. But to guard employees against undue indulgence of the employer by the Commissioner, the Act provides for double pay for such work. Consequently, an employer would not be apt to apply for a waiver save in a bona fide case of emergency.

When Act No. 49 was subsequently passed at the 1935 Special Session, the Legislature specifically provided in §7 that Act No. 80 and §553 of the Penal Code, as amended, shall remain in effect. The Legislature was thus preserving for workers the gains made under those Acts with reference to closing time, at the same time that it was establishing in Act No. 49 a similar principle relating to the maximum hours per day that could be worked. An example that comes readily to mind would be where an employee, although not required to work more than the eight-hour maximum provided in Act No. 49, was required to work, because of an emergency, beyond the closing time fixed in §553.

When Act No. 49 was passed, the Legislature was aware, from the experience gained under §553 and from the Governor's veto of a similar bill, that a limitation of hours could not be made inflexible. It therefore provided, in addition to

the emergency situations contemplated by §1, that (§2) "In cases where there is danger of losing a crop for lack of laborers, or when there is not sufficient personnel available to dispatch a shipment of fruit or other perishable product, the Governor of Puerto Rico, on recommendation of the Commissioner of Labor, may, in such specific cases, temporarily suspend the effects of this Act in regard to the limitation of hours, but not in regard to the double wages established for the hours worked in excess of the eight (8) working hours a day that are fixed by this Act."

There can be no question that there runs throughout Acts Nos. 49 and 80 a clear and persistent intent on the part of the Legislature for workers to receive double pay for extra time worked under the conditions recited in each of them. We take judicial notice that such emergencies have occurred since the date of the passage of the statutes, and that the Governor's emergency powers thereunder have been invoked. But this is a graphic illustration of the fact that, aside from such emergencies, we still have a flat prohibitory statute. Our difficulty here is that both sides conceded at the argument that there was no emergency or special circumstances in this case, and that virtually all the cases which will be controlled by our decision herein involve normal work. To award the employees double pay we must look to the statutes. And the Legislature, never having contemplated that this situation would exist, did not expressly provide therefor. Hindsight, it may perhaps be argued that it would have been more effective for the Legislature to provide, as in the Federal Act, for payment for overtime, and to make the crime the failure to make such payment rather than the work as such. This would undoubtedly prove more effective to prevent overtime work than absolute prohibition with a criminal sanction. But if the statute is to be rewritten to serve the present purpose under that more effective approach, it must be done by the Legislature and not by us.

Reading the statute as it was written rather than as experience teaches it should read, we find that, as to illegal work, it remains a criminal statute. The only provision for pay for overtime covers overtime which is legal. The question then immediately arises, if one *earns* double pay for legal overtime, why can we not gather the implication from the statute that, aside from the criminal penalty visited upon the employer for requiring such illegal overtime work, all overtime, legal or illegal, shall be compensated at the double rate of pay?

The stumbling block here is that the workman does not, strictly speaking, earn the double rate. To work overtime is undoubtedly a real hardship to an employee, and he may rightly feel that, when he has been paid double for such overtime, he has earned it. But Act No. 49 is a blanket statute covering all types of workmen—agriculture, commercial, industrial. We take judicial notice that in Puerto Rico the overwhelming majority of such workmen have no special skills, and that under our chronic unemployment conditions could easily be replaced. Effecting such a change of employees at the ninth hour would eliminate the necessity of payment at the double rate. It therefore becomes apparent that under the circumstances the double pay is a deterrent and not, strictly speaking, compensation as such for the services rendered, as fixed by the market rate for such services. Indeed, a fatigued employee, subject to a higher accident risk, is, objectively speaking, worth perhaps less rather than double the ordinary rate of pay. In that sense, the Legislature was legislating in the interest of the entire community when it commanded that he stop work at that point. In any event, the conclusive factor herein is that when the Legislature undertook to deal with the situation and to impose statutory duties on the employer, it interfered with the free negotiation between him and his employees for compensation for overtime. We make it plain that under

proper circumstances the Legislature has every right to make a reasonable provision for extra pay for overtime. But when it fails to do so, we cannot arrogate to ourselves the performance of that legislative function.

It is no answer to this difficulty to say that the provision for double pay is not a penalty. It is certainly not a penalty in the traditional sense of punishment for offense against the State. "Statutes giving a private action against the wrongdoer are sometimes spoken of as penal in their nature, but in such cases . . . . neither the liability imposed nor the remedy given is strictly penal" (*Huntington* v. *Attrill*, 146 U. S. 657, 67) Congress used the label "liquidated damages" in the Fair Labor Standards Act, and the Supreme Court of the United States has held that such liquidated damages "are compensation, not a penalty or punishment by the Government" (*Overnight Motor Co.* v. *Missel,* 316 U. S. 572, 83). To the same effect, *Cox* v. *Lykes Brothers,* 143 N. E. 226 (N. Y. 1924); *Atchison, etc., Ry.* v. *Nichols,* 264 U. S. 348. Yet Judge Cardozo, speaking for the New York Court of Appeals, discloses the hybrid nature of such a provision by pointing out in the *Cox* case that (p. 227) "the same provision [for double wages for failure to pay a seaman on time] may be penal as to offender and remedial as to the sufferer." (Matter in brackets ours). In any event, whether they be characterized as penal or not, provisions for such civil relief, whether called "punitive" damages (*Minneapolis Railway Co.* v. *Beckwith,* 129 U. S. 26, 34) "exemplary" damages (*James–Dickinson Co.* v. *Harry,* 273 U. S. 119), or, as in the Fair Labor Standards Act, "liquidated" damages, there is no right of recovery therefor, in the absence of specific legislation to that effect. To that extent at least, such private civil sanctions must be assimilated to a penalty. That is made clear by the very case on which the employees rely herein. In *Turney* v. *J. H. Tillman Co.,* 228 P. 933 (Ore., 1924) the court said at p. 935

"The provision of the statute . . . that the person so em-ployed [in an emergency] shall receive double pay for such overtime, is evidently intended as a deterrent to check an employer requiring such laborers to work overtime. It is somewhat in the nature of a penalty for a seeming variance of the general rule in addition to the [criminal] penalty provided for . . ." (Matter in brackets ours). Likewise, in *Bunting* v. *Oregon*, 243 U. S. 426, even where the overtime is legal, the court said at p. 436 "The provision for over-time is permissive, in the same sense that any penalty may be said to be permissive. Its purpose is to deter . . .". And our own Legislature provided in a more recent statute that failure to pay the workman the minimum wage estab-lished pursuant thereto entitles him to sue for such wages "plus an amount equal to fifty (50) per cent of the unpaid amounts as an additional penalty . . .". (Section 25, Act No. 8, Laws of Puerto Rico, 1941).[2]

When we turn to the law on penalties, we find that pen-alties must be so clear and so express that he who reads while he runs will see them. No rule of law is better set-tled than the rule that penalties must be express, and cannot be implied. But the only penalty provided in Act No. 49 for those employers who are illegally employing laborers beyond nine hours is the criminal provision. It may be that experience has shown that a statute such as this cries out for the civil sanction of double pay rather than a flat crimi-nal prohibition. We readily concede that the most effective enforcement of Act No. 49 would come from permitting the laborer to collect double pay for overtime. But that does not alter the fact that the Legislature has not yet so pro-vided. This is not simply a chink in the protective armour of the statute. It is a yawning gap in the statute; filling

---

[2] It is perhaps not necessary to add that any references to Act No. 8 of 1941 in this opinion have been simply by way of example. It would not be appropriate for us in this case to pass on the scope or validity of that statute or any provision thereof.

it is beyond the tinkering power of the courts, which can legislate only interstitially (*Ballester* v. *Court of Tax Appeals*, 60 P.R.R. 749).

We have recently held that, no matter how badly a penalty is needed in the public interest, we are powerless to place ourselves in the position of the Legislature and to impose such penalty (*American R. R. Co.* v. *Industrial Commission*, 61 P.R.R. 304, decided March 10, 1943). In the same way, however harsh a penalty may seem, once it is clearly and constitutionally imposed by the Legislature, we cannot mitigate hardships resulting therefrom by circumscribing the scope of the penalty (*General Motors Acc. Corp.* v. *Brañuela*, 61 P.R.R. 701, decided April 5, 1943), although we do examine each situation carefully to determine if the Legislature intended to impose the penalty in question (*West India Oil Co. (P. R.)* v. *Buscaglia, Treas.*, 61 P.R.R. 755, decided April 15, 1943). In short, a penalty written into a statute by the Legislature will not be construed away by this court; and a penalty not written into a statute will not be conjured up or implied by this court.

The petitioner cites several cases similar to the instant case in which recovery was denied, either for double or for ordinary pay. These cases will be hereinafter noted in our discussion of the alleged liability of the employer for the ordinary rate of pay for overtime. The employees rely mainly on *Turney* v. *J. H. Tillman Co.*, 228 P. 933 (Ore., 1924), in which double pay was recovered. Our difficulty with that case is twofold. In the first place, the plaintiff there alleged that the defendant (pp. 933–4) "was engaged in carrying on certain state work under a written contract with the state of Oregon for the building and paving of certain state highways near Seaside, in the state of Oregon; and for the benefit of all laborers employed on said work a special provision was made in the contract that eight hours should constitute a day's work, and all employees upon said

work who should perform work or labor in excess of eight ·hours a day should be compensated therefor ˙upon the basis and ·at the rate of double pay for all such excess or over‑ time above eight hours for each day or night shift.''

We therefore have a situation where, apart from any statutory provision, there was a contract to pay double for overtime. In the instant case the employees, while they al‑ lege a contract, rely on Act No. 49 to justify doubling their pay for overtime, and not on any specific contract to that effect. And, as we have seen, Act No. 49 is silent on the subject of double pay for overtime worked under normal conditions.

Secondly, the statute in the *Turney* case prohibited work for more than eight hours (p. 934) ''except in cases of nec‑ essity, emergency, or where the public policy absolutely re‑ quires it, in which event the person or persons so employed for excessive hours shall receive double pay for the over‑ time so employed; and no emergency, necessity or public policy shall be presumed to exist when other labor of like skill and efficiency, which has not been employed full time, is available''.

There was apparently no requirement in that statute for permission from a government official to work during an emergency. If an emergency existed, one simply proceeded to work. Under those circumstances, the court held, as al‑ ready noted above, that an emergency, as a matter of plead‑ ing, would be presumed. But here, since our statute re‑ quires a permit, even during an emergency, in order to make overtime work legal, we do not think it appropriate to pre‑ sume· the emergency. In addition, as˙ we have already in‑ dicated, although only one case is actually before us, the is‑ suance of the writ in this case was predicated on condition in which no element of emergency was involved. We there‑ fore prefer, in order to give our decision some practical value, to treat the work done as normal, and therefore per‑ formed in violation of Act No. 49.

We believe it appropriate to point out that the *Turney* case did not rest its holding exclusively on the presumption of emergency. It placed its holding on the additional ground that the statute was designed to protect the laborer, and that he should therefore recover double pay even if there was no emergency, in which event the work was illegal. However, even under this theory, we do not have in our case, as in the *Turney* case, a specific contract providing for double pay for all overtime. Candor compels us to add that even upon the hypothesis that the *Turney* case relied on the statute rather than on a contract, we are unable, as already noted, to find such a specific provision in our statute for overtime under normal conditions.

We therefore hold that, in the absence of a specific statutory provision providing for double pay for normal work in excess of the ninth hour, this court cannot rewrite Act No. 49 to create such an obligation.

 The employer would also have us deny the worker's right to recover pay at the ordinary rate for time worked in excess of the statutory minimum. On the theory that the laborers are *in pari delicto* with the employer, he seeks to persuade us that we should leave the parties where we find them. We therefore turn to the statute to determine if the laborers are *in pari delicto*.

Act No. 49 provides in §1 that "No person shall be employed or shall be permitted to work" more than eight hours a day. At first blush it might seem, as the petitioner contends, that the phrase "or shall be permitted to work" is a prohibition directed at the conduct of the workmen. But when we examine the statute as a whole, and find that under §8 only the employer may be prosecuted for violations of the Act, and that the definition of an employer found in §4 includes managers and foremen, we conclude, particularly if we bear in mind that the purpose of the Act is in the first instance to benefit the workmen and through them the com-

munity as a whole, that the phrase in question is directed
solely at the employer, and is designed to make the language
inhibiting his conduct as broad as possible, so that he may
not, by thrusting an intermediary such as a foreman be-
tween himself and the worker, insulate himself from liability.
We reached this same result, as have other state courts, in
construing similar language in *Montaner* v. *Industrial Com-
mission,* 54 P.R.R. 64, 66.

■■ The petitioner nevertheless urges that even though
it be held that the workmen are not strictly speaking *in pari
delicto* with their employers, no recovery should be had here-
in by the employees. We therefore examine this contention
next.

The civil and the common law unite .in holding that, gen-
erally speaking, illegal bargains are void and that a contract
made in violation of a statute is contrary to public policy
and cannot be enforced by either party. (Section 1227, Civil
Code, 1930 ed.; Restatement, Contracts, §598; 5 Williston
on Contracts, Revised Ed., §1630.) But once more, as so
often in the law, we find a general proposition which does
not automatically produce the answer to a particular prob-
lem. It may be readily admitted that the courts would not
enforce an executory contract of employment, the terms of
which provided for commission of a crime by the employer
in violation of Act No. 49. But we are not concerned here
with enforcement of an illegal contract. In the instant case
the contract, assuming it once existed, has been fully per-
formed on one side. Are we under those circumstances to
leave the parties as we find them, or are we to permit the
workman to recover the value of services which he has ren-
dered to an employer who has paid nothing for them?

The statute itself does not furnish an explicit answer to
this question. The Legislature might have taken the drastic
step of barring recovery. Or it might have provided spe-
cifically that the criminal liability of the employer would not

*ipso facto* produce civil immunity. But the Legislature wrote neither of these provisions into the statute. Under those circumstances, to assert that this is a void contract and that the courts will not lend themselves to its enforcement is merely to state a shibboleth. One must dig deeper, discover the intention of the Legislature and the public policy behind the statute, and, if possible, reach the result which will best conform thereto.

The various facets of the problem of illegal bargains and the fruits thereof do not always fit into the same tight category. The courts in continental United States have wisely refused to apply a rigid rule of law and to reach the same mechanical result in every case. Different facts and varying considerations of policy frequently produce different answers. The annotation found at 120 A.L.R. 1461 points out that "The general rule that neither party to an illegal transaction may take any proceeding against the other for the restoration of property or for the repayment of money transferred or paid in the course of the transaction is subject to an exception in favor of persons for whose protection the law made the transaction illegal". For example, a borrower cannot be heard to say that a bank has exceeded the statutory limit in making a loan to him (*Gold-Mining Co.* v. *National Bank,* 96 U. S. 640); a bank director can be sued by a bank for a loan made to him, although it is a criminal offense for a director to borrow from a bank (*Lester* v. *Howard Bank,* 33 Md. 558); a milk dealer who commits a crime by failing to obtain a license to sell milk may nevertheless recover from the purchaser the value of the milk sold by him (*John E. Rosasco Creameries, Inc.* v. *Cohen,* 11 N. E. (2d) 908 (N. Y., 1937). To the same effect, *Smith* v. *Bach,* 183 Cal. 259; *Washington County* v. *Frochlich Mercantile Co.,* 223 N. W. 575 (Wisc., 1929); *Rosenberg* v. *Hano,* 121 F. (2d) 818, 22 (C.C.A. 3rd, 1941); *First Federal Sav. & Loan Ass'n* v. *Ansell,* 41 N. E. (2d) 420 (Ohio, 1941); *Ore-*

*gon & Western Colonization Co.* v. *Johnson,* 102 P. (2d) 928, 36; Note, Principles Governing Recovery by Parties to Illegal Contracts, 26 Harv. L. Rev. 738. The Restatement, Contracts, §601, reads as follows:

"§ 601. Recovery on an Illegal Bargain Because of the Effect of Refusal.

"If refusal to enforce or to rescind an illegal bargain would produce a harmful effect on parties for whose protection the law making the bargain illegal exists, enforcement or rescission, whichever is appropriate, is allowed."

We recognize that some of these authorities do not squarely meet the problem in this case. To ameliorate the harsh results of strict application of the "void for illegality" rule, the courts in those cases have talked in terms of "collateral illegality" and "new and independent considerations"; in other cases they have asserted that "if a plaintiff can establish his case without directly relying on the illegality, then he can recover". None of those formulae apply directly to the facts herein, although they could be utilized to explain how we upheld a prosecution for embezzlement of money originally collected on an illegal lottery (*The People* v. *Medina,* 19 P.R.R. 676), and how we permitted recovery of money deposited by a plaintiff with a defendant even though the money represented the fruits of an illegal contract in which the parties had jointly participated (*González* v. *Ortiz,* 17 P.R.R. 563). We note in passing that the statement in the *Medina* case at p. 677 that "the rule is well settled that in lottery transactions, as in all unlawful contracts generally, the courts will leave the parties where it found them and will not lend its aid either to enforce or rescind the contract" is not decisive herein, as we are confronted not with an executory contract but with one fully performed on one side.

We come somewhat closer to the instant case, although no element of criminality was involved, when we examine

*F. Carrera & Hno.* v. *Aquino,* 60 P.R.R. 140, where we held that a wholesale merchant who had sold goods in excess of $300 to a retailer could recover therefor, in spite of the fact that although §82 of the Code of Commerce (1932 ed.) provided that oral testimony would not be sufficient to prove the existence of such a contract, only oral testimony in support thereof was offered at the trial. This Court might conceivably have held that the public policy embodied in §82 required us to retain undefiled the rule laid down therein. Yet the manifest injustice of permitting a party to a contract to take refuge in §82 after the other party had fully performed his obligations under the contract persuaded us to hold that the public policy involved would not be defeated by holding the statute inapplicable in cases where complete performance had been had on one side. We held to this effect, although in that case we could not fall back on such dogma as "collateral illegality" and "establishing a case without directly relying on the illegality". For an excellent opinion to the same effect, see *Hummel* v. *Hummel,* 14 N. E. (2d) 923 (Ohio, 1938).

Admitting that the employees herein require the aid of the illegal transaction to sustain their case, we come to the problem raised in the instant case by the claim of the workers for ordinary pay for the illegal overtime for which they have received no compensation. As Gellhorn points out in Contracts and Public Policy, 35 Col. L. Rev. 679, 82, Legislatures, when adopting penal statutes, have rarely had in mind the problems of contract law that may thereafter arise. Their attitude has been that if they make something a crime, that thing will promptly disappear. When, contrary to expectation, such anti-social activities have not vanished forthwith, the courts, in view of the silence of the Legislature, have been faced with the necessity of determining—and have reached divergent conclusions—"as to whether the legislature 'intended' contracts to be treated as void when they ran

afoul of laws which penalized some act of the contractors, but which said nothing concerning enforcement of the bargains''.

We recognize that *Lewis* v. *Ferrari,* 90 P.(2d) 384 (Calif., 1939), *Short* v. *Bullion–Bech & Champion Min. Co.,* 57 Pac. 720 (Utah, 1899), *Martínez* v. *Johnson,* 119 P. (2d) 880 (Nev., 1941), *Montgomery Ward & Co.* v. *Luck et al.,* 52 S. W. (2) 1110 (Tex., 1932), and *Glendale* v. *Dixon,* 75 P. (2d) 683 (Ariz., 1938), have, in situations like the instant case, denied the worker the right to recover for overtime. Under some of the statutes involved in those cases the employee was equally guilty of crime; in others he was not.

There is no infallible answer to this question. Our Legislature, apparently believing, as Gellhorn points out, that making an act a crime eliminates all possibility of future commission of such acts, was silent on the question. The above-cited cases would deny recovery because the ''Plaintiff concurred in an illegal act. Defendant committed an offense, and plaintiff aided and abetted its commission . . . . The statute could not have been violated in this case without plaintiff's cooperation. To permit her to recover under such circumstances would allow her to take advantage of her own wrong in encouraging a crime which tended to thwart a benevolent legislative design'' (*Martínez* v. *Johnson, supra,* at p. 882).

The other point of view is expressed by the dissenting opinion in the *Short* case at p. 725: ''To deny the right of the plaintiff to recover the reasonable value of the extra labor performed at the request of the defendant, is to punish him whom the legislature intended to protect by said act, and reward the culpable party for an extortion which the act was passed to prevent.''

In denying recovery, some of the cases rest their holding, at least in part, on the ground that the ''plaintiff and defendant were on contractual parity''. (*Martínez* v. *Johnson, supra,* p. 863). But the very theory on which legisla-

tion limiting hours was originally sustained recognizes that no such contractual parity exists. "The legislature has also recognized the fact, which the experience of legislators in many States has corroborated, that the proprietors of these establishments and their operatives do not stand upon an equality, and that their interests are, to a certain extent, conflicting. The former naturally desire to obtain as much labor as possible from their employees, while the latter are often induced by the fear of discharge to conform to regulations which their judgment, fairly exercised, would pronounce to be detrimental to their health or strength. In other words, the proprietors lay down the rules and the laborers are practically constrained to obey them. In such cases self-interest is often an unsafe guide, and the legislature may properly interpose its authority." (*Holden* v. *Hardy*, 169 U. S. 366, 397). The Supreme Court of the United States has recently reaffirmed this doctrine. "The point that has been strongly stressed that adult employees should be deemed competent to make their own contracts was decisively met nearly forty years ago in *Holden* v. *Hardy, supra,* where we pointed out the inequality in the footing of the parties". (*West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379, 93.)

Much is made by the petitioner of the fact that Act No. 49 was upheld as constitutional in *M. Taboada* v. *Rivera Mortinez, supra,* on the ground that the Act was not class legislation but was designed to benefit all concerned, employers, employees, and the community as a whole. With that as a premise, the petitioner argues that to permit any recovery whatsoever for time worked in excess of nine hours —not, be it noted, double pay for this extra time, but even ordinary pay—would defeat the purposes of the Act (*a*) to preserve the health of workmen and (*b*) to spread employment, and would by judicial legislation convert the statute, contrary to the will of the Legislature, into a statute merely providing for overtime pay, thereby robbing the employed

of their health and leisure and the unemployed of their opportunity to work. Public policy, the petitioner therefore asserts, requires us, in order to effectuate the purposes of Act No. 49, to hold that the laborer shall take nothing for overtime labor.

It is familiar doctrine to refer to statutes such as Act No. 49 as designed to benefit the community as a whole. But this does not mean that the particular worker's rights are not given prime consideration by the courts. What that language means is that when workers, who are an important part of the community, are decently paid and are kept healthy, together with the widest possible distribution of employment, the results of such a pattern of paternalistic legislation, although specifically directed to aid particular workers, redound to the benefit of the community as a whole.

It must be confessed that permitting the workmen to recover herein will not in and of itself advance the avowed public policy of Act No. 49 to insure healthy workmen and to spread employment. But the courts must take the facts as they find them. And in the instant case we are informed by all the parties that thousands of cases similar to the present case are pending. We are therefore not in the situation of the courts which have asserted that "It is far more important to labor from a standpoint of health and the division of work that the eight-hour law be preserved than it is that an *occasional* violator of it be permitted to recover for the time he spends in transgressing it. One who works more than 8 hours a day when no emergency exists not only defeats the law so far as it pertains to health but deprives some other person of the opportunity to work the extra hours and earn a living for himself and his family". (*Glendale* v. *Dixon, supra,* at p. 684; Italics ours). We cannot be unmindful of the factual situation confronting us. In one breath the employer tells us that to permit recovery herein would be to grant relief in thousands of suits against small,

medium and large business establishments involving millions of dollars and thereby to wreck the economy of Puerto Rico. Yet in the next breath the employer would have us establish a public policy founded on *occasional* violation of the statute.

Gellhorn at p. 688 of the article cited above criticizes adversely the doctrine laid down in the *Short* and kindred cases. Yet we recognize that all the cases to which our attention has been called are in accord with the *Short* case, except *Turney* v. *J. H. Tillman Co.*, 228 P. 933 (Ore., 1924), another Oregon case following the *Turney* case (*Pederson* v. *City of Portland,* 24 P. (2d) 1031 (Ore., 1933)), and, on this particular question, *Thibault* v. *National Tea Co.*, 269 N. W. 466 (Minn., 1936). Nevertheless, although for reasons already noted, we are unable to follow the *Turney* case in its holding that the workers are entitled to recover double pay for work in excess of the ninth hour, we agree, as to the suit for ordinary pay for such work, that "It would be depleting the statute of its meaning and defeat its purpose if such a construction should be given to the law that would prevent the laborer from collecting for work in excess of eight hours per day, although the employer might violate the statute in requiring such work. Ordinarily the offending party should not be allowed to take advantage of its own wrong in order to escape liability." (*Turney* v. *J. H. Tillman Co., supra,* at p. 935).

We emphasize that we do not quarrel with the holding in the above-cited cases that a contract for such overtime work is against public policy and will not be enforced by the courts. We part company with them when they likewise conclude that even after full execution of the contract by the worker, public policy also demands, in spite of the silence of the Legislature on the subject, that the fruits of his efforts shall remain in the hands of the employer rather than be restored to the workman for whose benefit the statute was in the first instance enacted.

We have found no case in this jurisdiction directly in point. The closest case is *Montaner* v. *Industrial Commission*, 54 P.R.R. 64. There we held that a child was covered by the Workmen's Compensation Act, in spite of the fact that by employing him without a permit his employer was committing a crime. In the *Montaner* case this court was faced with the public policy against child labor, which is at least as strong as the public policy in favor of maximum hours for adult labor. The instant case would therefore seem to be an *a fortiori* case under the *Montaner* case, especially when it is recalled that (*a*) as to workman's compensation, the minor was at the most a third party beneficiary of the contract between the employer and the State Fund, (*b*) even if workman's compensation had been denied, the minor could probably have had recourse to an ordinary action against the employer, and (*c*) there was no injust enrichment in the sense that the minor had earned his workman's compensation as compared to workmen herein who have worked overtime without pay. Cf. *Oklahoma Portland Cement Co.* v. *Pollock*, 73 P. (2d) 427 (Okla., 1937).

The employer could perhaps argue that the *Montaner* case is distinguishable under cases already considered in that the question of workman's compensation was collateral to the illegal contract of employment, and that the case therefore did not hold that a child who worked under such illegal conditions could thereafter recover his wages. But this court specifically said in the *Montaner* case, whether it be called *dictum* or not, that (p. 66) "Both the punishment (see §19) and limitation are directed at the employer. The contract of employment may be enforced by the child with respect to earned wages.

*Traders & General Ins. Co.* v. *Rogers*, 119 S.W. (2d) 679 (Tex., 1938) held that an employee who worked in a restaurant without obtaining the doctor's certificate required

by law could not recover workman's compensation. In so holding it relied on *Montgomery Ward & Co.* v. *Lusk, supra,* and *Short* v. *Bullion-Beck & Champion Min. Co., supra.* Having refused in the *Montaner* case to follow the doctrine of the *Rogers* case, we àre being consistent herein in rejecting the *Short* and other cases on which the *Rogers* case relies.

We are unable to distinguish on the matter before us between the public policies involved in prohibiting child labor and in prohibiting excessive adult labor. Both groups are under the protective arm of the government. If one may recover for such illegal work, the other should be given the same right. Williston takes this position as a general proposition. "If a plaintiff though culpable has not been guilty of moral turpitude, and the loss he will suffer by being denied relief is wholly out of proportion to the requirements either of public policy or of appropriate individual punishment, he may be allowed to recover back the consideration with which he has parted." (6 Williston on Contracts, Rev. ed., §1789). The Restatement, Contracts, §604, is even clearer. *"Recovery by a Party Not in Pari Delicto.* Where the parties to an illegal bargain, though both blameworthy, are not in pari delicto, and one of them has not been guilty of serious moral turpitude, he can repudiate the bargain, and if he has rendered any performance thereunder, recover it or its value."

Although the analogy is not a perfect one, we note that this court has been willing to prevent unjust enrichment to import into the civil law the doctrine of constructive trusts. *Ruiz* v. *Ruiz,* 61 P.R.R. 794, decided April 28, 1943. See 51 Harv. L. Rev. 929, 30. We should do as much for workmen who have worked without compensation. We need not accept the invitation of the employers to make an extensive excursion into semantics in order to assert that there is unjust enrichment of an employer whose employees work without compensation.

Finally, there is a conclusive answer to the contention that the workman should not be permitted to recover ordinary pay for work beyond the ninth hour. Such pay is earned by the workman. To bar recovery therefor would be to penalize him. We have seen that penalties must be express, and cannot be implied. Finding that it is essentially a penalty, we have refused, in view of the silence of the Legislature on the subject, to permit recovery of double pay by the employees for work in excess of nine hours. By the same token, inasmuch as the Legislature has not specifically prohibited recovery of the ordinary pay which the employee has earned for such work, we cannot by implication read such a provision into Act No. 49.

In addition to the foregoing considerations which have led us to the conclusion that a reasonable construction of Act · No. 49 and the public policy embodied therein impel us to hold that the worker is entitled to recovery at the ordinary rate for the extra hours which he has worked beyond the ninth hour, we believe that §1257 of our Civil Code is applicable to this situation. That Section, referring to nullity of contracts, reads as follows:

"When the nullity arises from the illegality of the consideration or the object of the contract, if the fact constitutes a crime or misdemeanor common to both contracting parties, they shall have no action against each other and proceedings shall be instituted against them, and furthermore, the things or sum which may have been the object of the contract shall be applied as prescribed in the Penal Code with regard to the goods or instruments of the crime or misdemeanor.

. "This provision is applicable to the case in which there is a crime or misdemeanor on the part of only one of the contracting parties; but the one who is not guilty may recover what he may have given, and shall not be bound to fulfill what he may have promised."

Relying on several cases decided by this court, the petitioner next asserts that the complaints herein do not state

facts sufficient to constitute a cause of action. *García* v. *Cañada,* 11 P.R.R. 403, held that under our Civil Code a complaint for domestic services which failed to allege an agreement to pay wages, or some custom or practice to that effect, was defective. Noting at p. 407 that "It has been very common in Porto Rico for servants to enter the employ of a person relying on an agreement to board and lodge them", this court went on to hold that "In view of the state of the law we cannot assume that there was a custom or practice to pay wages *in this class of hiring or services*" (Italics ours). It is interesting to note that in the course of the opinion, after this court pointed out at p. 406 that "In most of the States of the Union where the common law prevailed, if a person performed work or labor for another the law generally implied a contract on the part of the employer to pay a reasonable wage", the court said at p. 407 that "the principles prevailing under our Civil Code and in the States do not present a great degree of difference."

There is, however, no escape from the fact that in a subsequent case, *Agosto* v. *Woods,* 13 P.R.R. 356, quoting *García* v. *Cañada* as a precedent, this court clearly held without qualification that in a suit for compensation for services a complaint is defective if it does not allege either (p. 361) "the existence of a certain agreed price" or that (p. 362) "the price of the services is recognized by custom and frequent usage in the place where such services were rendered". To the same effect, *Ledesma* v. *Araujo,* 15 P.R.R. 234, 38.

Nevertheless, in the most recent case on this subject, on facts almost identical to those found in *Agosto* v. *Woods* this court did not categorically rule that in the absence of a certain agreed price or customary rate, there could be no recovery for services rendered. We said in *Ex parte Capó,* 59 P.R.R. 891, at p. 894 that "Even conceding, *without holding,* that the claimant was entitled to recover the just and reasonable value of his services, we would always have to

affirm the judgment appealed from because of the failure to introduce any evidence whatever on that particular.'' (Italics ours).

We are not called on in this case to reexamine the rule laid down in the cases just discussed. All of them, except *Ex parte Capó*, were decided in the early 1900's, many years prior to the enactment of Act No. 49 of 1935. That statute was enacted in the light of more modern conditions. It is obvious that it has a different direction and purpose than the earlier Code provisions. In many instances its terms override even specific agreements. Whether it also supplies specific terms of a labor contract where such terms are lacking, is a question we need not be concerned with here. It is sufficient for our purposes to point out that the cases cited are not controlling herein because a specific contract for work at $1.68 a day is alleged in this case. We take this to mean that the employees contend that their contract as a matter of fact was for 8 hours at $1.68. The employees then allege further that they worked four extra hours per day and pray for double pay therefor by virtue of the provisions of Act No. 49. Although we have held that Act No. 49 does not specifically provide that time worked in excess of nine hours must be compensated for at double the ordinary rate, a wholly different situation obtains with reference to the claim for pay at the ordinary rate for those extra hours. Without determining in detail to what extent, if any, the rule of *Agosto* v. *Woods* has been modified by Act No. 49 and other statutes, we are satisfied that, even under the original rule, an allegation of a contract or of customary pay at a specified rate of pay is a sufficient allegation to enable recovery at that same rate of pay for time worked beyond the contract or customary time. And if the matter of nicety of pleading is raised, it must be remembered that these cases originated in the Municipal Court by virtue of complaints signed by the workmen alone, and that §6 of

Act No. 10, Laws of Puerto Rico, 1917 (II, p. 216), enjoins the courts to ignore defects of form in suits for wages brought thereunder.

■ The final proposition of the petitioner is that there is a presumption that laws are complied with, and in the absence of any allegation to the contrary in the complaint, we should presume that the defendant, by paying $1.68 per day, has already paid not only the ordinary rate, but even double the ordinary rate, for all hours worked over eight in any one day. A complete answer to this contention is found in *Warren-Bradshaw Co.* v. *Hall*, 317 U. S. 88, involving the Fair Labor Standards Act, at p. 93:

"One final contention merits but slight consideration. Respondents were employed on the basis of an eight hour day and regularly worked seven days a week, receiving fixed wages ranging from $6.50 to $11 per day. There was no agreement providing for an hourly rate of pay or that the weekly salary included additional compensation for overtime hours. Petitioner urges that it complied with the overtime compensation requirements of the Act because respondents received wages in excess of the statutory minimum wage, including time and one-half of that minimum wage for all overtime hours, which wages respondents impliedly agreed included overtime compensation by accepting them. A similar argument was squarely rejected in *Overnight Motor Co.* v. *Missel*, 316 U. S. 572."

In the *Overnight Motor Co.* case, the problem was treated as follows at p. 581:

"Petitioner invokes the presumption that contracting parties contemplate compliance with law and contends that accordingly there is no warrant for construing the contract as paying the employee only his base pay or 'regular rate,' regardless of hours worked. It is true that the wage paid was sufficiently large to cover both base pay and fifty per cent additional for the hours actually worked over the statutory maximum without violating section six. But there was no contractual limit upon the hours which petitioner could have required respondent to work for the agreed wage, had he seen fit to do so, and no provision for additional pay in the event the hours worked required minimum compensation greater than the fixed wage. Implication cannot mend a contract so deficient in complying with the law.

This contract differs from the one in *Walling* v. *Belo Corp.*, *post*, p. 624, where the contract specified an hourly rate and not less than time and a half for overtime, with a guaranty of a fixed weekly sum, and required the employer to pay more than the weekly guaranty where the hours worked at the contract rate exceeded that sum.''

When the *Overnight Motor Co.* case is read together with *Walling* v. *Belo Corp.*, 316 U. S. 624, it becomes clear that the actual minimum rate per hour is a matter of fact, depending on the agreement between the parties or the governing custom. As the Court points out in the *Belo Corp.* case (p. 631–2) ''In its initial stage the question to which this dispute gives rise is a question of law, a question of interpretation of the statutory term 'regular rate'. But it is agreed that as a matter of law employer and employee may establish the 'regular rate' by contract. . . . The question remains whether the $40 [agreed weekly rate in that case; $1.68 agreed daily rate in our case] contemplates compensation for overtime as well as basic pay.'' (Matter in brackets ours).

*Wilson* v. *New*, 243 U. S. 332, and *Nelson* v. *St. Joseph & G. I. Ry. Co.*, 205 S. W. 870 (Mo. 1918) arose under the Adamson Act and are not applicable to the instant case. That Federal Act went further than Act No. 49, which simply provided that eight hours shall be a normal day's work. Section 1 of the Adamson Act provided not only that ''eight hours shall, in contracts for labor and service, be deemed a day's work'' but went on to provide that eight hours shall be ''the measure or standard of a day's work for the purpose of reckoning the compensation for services of all employees . . . ''. In the absence of a provision like the last clause, Act No. 49 is governed by the principle laid down in the *Overnight Motor Co.* and *Belo Corp.* cases.

Under the Fair Labor Standards Act the contract or customary rate cannot be less than the minimum therein provided. But, as already noted, Act No. 49 provided no min-

imum rate, and, except for collective bargaining, there was nothing by way of insular law which has been called to our attention to prevent the parties from contracting for a starvation wage. We will not, of course, reframe the contract of the parties to make the $1.68 cover the twelve hours, by presumption or otherwise. But if the testimony at the trial shows that this was actually the intention or agreement of the parties, or that there was a prevailing custom to that effect, the workers have won an illusory victory by our holding that they are entitled to compensation at the ordinary rate for the tenth, eleventh, and twelfth hours. That is to say, if the parties actually contracted that the workman would be paid $1.68 for twelve hours, making an hourly rate of 14 cents an hour, the latter has already been fully compensated at the ordinary rate for all twelve hours, although he will, of course, still be entitled to the extra compensation for the ninth hour which the statute specifically provides he shall receive. Collective bargaining agreements, workmen's compensation records, individual written or oral agreements, Agricultural Adjustment Administration records, payments made when because of illness only part of a day was worked, and customs of the community or industry are illustrative sources of the facts to be found on this question by the lower courts.

Indeed, even if we went the whole way with the employees and held that Act No. 49 specifically provides for double pay for all hours worked in excess of eight hours in any one day, such a ruling might be a teasing allusion. Act No. 49 is not a minimum wage statute, and we cannot torture it into one. Any rights thereunder could therefore be made illusory without a minimum wage rate, obtained by legislation or collective bargaining. This is because, as already noted, there is nothing in Act No. 49 to prevent an employer from setting a low wage, which is doubled for overtime. Again we repeat that this should not be construed to mean we are holding

that each employer may at this date retroactively reconstruct artificially the arrangements under which his employees worked, in order now to assert that if a certain figure per hour is taken as the rate earned, the employee has already been fully compensated, even for the ninth hour at a double rate and for the hours in excess of nine hours at either the ordinary or double the ordinary rate. The intention of the parties is ascertained by determining what the actual arrangements, as gathered from all the circumstances, were at the time of employment. To this effect, see *Thibault v. National Tea Co., supra*.

We are aware of the difficulties which may arise in the effort to determine if the compensation originally paid covered all extra hours worked. We can only repeat that the situation herein is not of our making, and that the remedy therefor is not within our province.

In view of our holding that employees are entitled under Act No. 49 to double pay for the ninth hour of work during any natural day and ordinary pay for work in excess of nine hours, the writ of prohibition will be discharged and the case remanded to the lower court for further proceedings not inconsistent with this opinion.